UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHOSHONE-BANNOCK TRIBES OF
THE FORT HALL RESERVATION,

                            Plaintiff,

        v.                                           Civil Action No.  02-0254 (TFH)

DAVID BERNHARD, Acting Secretary of
the Interior, *et al.*,

                            Defendants.

## MEMORANDUM OPINION

Pending before the Court is the Shoshone-Bannock Tribes' ("the Tribes") Motion for

Clarification of the Settlement Agreement that the Tribes signed with the United States in 2012,

[ECF No. 90], along with their Motion to Enforce the Settlement Agreement, [ECF No. 103].

The United States opposes the motions. [ECF Nos. 95 & 104].

I.      **Background**

        The Tribes sued the Departments of Interior and Treasury in February 2002 seeking an

"accounting and reconciliation of its trust fund accounts and non-monetary trust assets or

resources" held in trust by the United States. Proposed Joint Stip. of Settlement [ECF No. 84]

(the "Settlement" or "Settlement Agreement"). The parties settled their dispute for $60 million

via a Settlement Agreement that the Court approved on May 16, 2012. Minute Order, May 16,

2012.

        In 2018, the Tribes sued the United States, federal officials, the Union Pacific Railroad

Company and the City of Pocatello in the United States District Court for the District of Idaho

over several plots of land in Pocatello, Idaho. *Shoshone-Bannock Tribes of Fort Hall Res. v. United States*, No. 18-cv-285-DCN (D. Idaho 2018). According to the Tribes, the 1868 Treaty of Fort Bridger guaranteed the Fort Hall Indian Reservation, which originally included Pocatello, to the Tribes as their permanent home. Mem. in Supp. Mot. for Clar. at 2 ("Mot. for Clar."). In 1882 and 1888, the Tribes granted the United States an interest in land around Pocatello to allow the United States to establish easements for railroads. *Id*. at 3. According to the Tribes, Congress ratified the easements and granted the Tribes a reversionary interest in the land when it was no longer used for railroad purposes. *Id*. The Tribes allege that they now have a present possessory interest in five parcels of land in Pocatello that the Union Pacific Railroad is no longer using for railroad purposes.[1] *Id*. at 2; *id*. Ex. D (Am. Compl. ¶ 25, ¶ 310). Amongst their claims against the United States, they seek a declaratory judgment that the Tribes have a present possessory interest in the parcels, Am. Compl. ¶ 310 (Count 1); they seek to quiet title to the parcels, Am. Compl. ¶¶ 316-409 (Counts II-VI); and they seek a writ of mandamus to compel the United States to transfer the parcels to the property inventory of the Bureau of Indian Affairs to hold in trust for the Tribes, Am. Compl. ¶¶ 410-424 (Counts VII).

The federal defendants moved to dismiss the complaint on the grounds that, *inter alia*, the Tribe's claims are barred by the Settlement Agreement's waiver provisions. Opp'n to Mot. for Clar. at 5 [ECF No. 95]. Because the Settlement provides that this Court retains jurisdiction to interpret and enforce it, on March 12, 2019, the Tribes filed a Motion for Clarification of Settlement Agreement in this Court. [ECF No. 90]. Since that time, the Idaho district court found that because the Agreement's language retained jurisdiction in this Court "'for the limited purpose of interpreting *and* enforcing'" the Settlement, the language "denotes that the D.C.

---

[1] The parcels are a bus depot and parking area, a credit union, a parking lot, a 49.92 acre parcel, and a 3.27 acre parcel of land. Mot. for Clar. Ex. D  (Am. Compl. ¶ 25).

District Court retains exclusive control over both interpretation *and* enforcement." *Shoshone-Bannock Tribes v. United States*, No. 18-cv-285, 2019 WL 2307437 at *1 (D. Idaho Oct. 15, 2018) (quoting the Settlement Agreement). The Idaho district court then stay the litigation pending this Court's interpretation of the Settlement Agreement. *Id*. at *2-3. Back in this Court, the Tribes subsequently filed their Motion to Enforce the Settlement Agreement [ECF No. 103].

## II.    The Settlement Agreement

The parties contest the meaning of the Settlement's waiver provision, which provides the following:

> 4.    Full Settlement, Waiver, Release, and Covenant Not to Sue.
>
> In consideration of the payment required by Paragraph 2 above, Plaintiff hereby waives, releases, and covenants not to sue in any administrative or judicial forum on any and all claims, causes of action, obligations, and/or liabilities of any kind or nature whatsoever, known or unknown, regardless of legal theory, for any damages or any equitable or specific relief, that are based on harms or violations occurring before the date of this Court's entry of this Joint Stipulation of Settlement as an Order and that relate to Defendants' management or accounting of Plaintiff's trust funds or Plaintiff's non-monetary trust assets or resources.

Settlement ¶ 4. The Settlement also includes a list of exceptions to the waiver, including its exception for the wrongful use of railroad rights-of-ways:

> 6. Exceptions to Plaintiffs Release, Waiver, and Covenant Not to Sue.
>
> Notwithstanding the provisions of Paragraph 4 above, nothing in this Joint Stipulation of Settlement shall diminish or otherwise affect in any way: . . .
>
> i. Plaintiff's claims against third parties for the wrongful use of railroad rights-of-ways located off the Fort Hall Reservation; . . .

Settlement ¶ 6(i) ("Paragraph 6(i)"). According to the Settlement, the Court retains "continuing jurisdiction only for the limited purpose of interpreting and enforcing the terms and conditions of this Joint Stipulation of Settlement." Settlement ¶ 23.

### III.    Motion for Clarification

In their motion for clarification, the Tribes ask that the Court clarify that Paragraph 6(i)

of the Settlement does not waive their claims against the United States arising from the wrongful

use of railroad rights-of-way. If it does waive them, the Tribes ask the Court to find that their

claims arose after May 16, 2012, when the Court accepted the Settlement. Mem. In Supp. of

Mot. for Clar. at 1 (hereinafter "Mot. for Clar.").

### A.    Legal Standard

"As a general rule, 'a party may ask the district court to issue an order clarifying . . . a

consent decree.'" *United States v. Volvo Powertrain Corp.*, 758 F.3d 330, 344 (D.C. Cir. 2014)

(quoting *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 860 (9th Cir. 2007)) (edit

accepted). "The general purpose of a motion for clarification is to explain or clarify something

ambiguous or vague, not to alter or amend." *United States v. All Assets Held,* 315 F. Supp. 3d 90,

99 (D.D.C. 2018) (quoting *United States v. Philip Morris USA, Inc.*, 793 F. Supp. 2d 164, 168

(D.D.C. 2011)). "[C]ourts in this circuit have encouraged parties to file motions for clarification

when they are uncertain about the scope of a ruling." *Id.* (citing *Volvo Powertrain Corp.*, 758

F.3d at 344).

Courts "interpret a settlement agreement under contract law." *Gonzalez v. Dep't of

Labor*, 609 F.3d 451, 457 (D.C. Cir. 2010). The parties agree that federal common law governs

their agreement. The federal common law of contracts "largely 'dovetails' with 'general

principles of contract law.'" *Deutsche Bank Nat'l Tr. Co. v. Fed. Deposit Ins. Corp.*, 109 F.

Supp. 3d 179, 197 (D.D.C. 2015) (quoting *NRM Corp. v. Hercules, Inc.,* 758 F.2d 676, 681 (D.C.

Cir. 1985)). "Where the language of a contract is clear and unambiguous on its face, a court will

assume that the meaning ordinarily ascribed to those words reflects the intention of the parties."

*Mesa Air Grp., Inc. v. Dep't of Transp.*, 87 F.3d 498, 503 (D.C. Cir. 1996) (quoting *NRM Corp.*,

758 F.2d at 681). "Only if the court determines as a matter of law that the agreement is ambiguous will it look to extrinsic evidence of intent to guide the interpretive process." *NRM Corp.*, 758 F.2d at 682. "[A] contract does not become ambiguous merely because the parties disagree on its interpretation." *Johnson v. Reno*, No. 93-cv-206, 1996 WL 33658687, at *6 (D.D.C. Apr. 17, 1996).

**B.    The Settlement Unambiguously Waives the Tribe's Pre-2012 Right-of-Way Claims Against the United States.**

Although Paragraph 6(i) retains the Tribes' "claims against *third parties* for the wrongful use of railroad rights-of-ways located off the Fort Hall Reservation," Settlement ¶ 6(i) (emphasis added), the Tribes argue that the paragraph was not meant to foreclose the Tribes from asserting these claims against the United States. The Tribes point to extrinsic evidence to support their interpretation. The first document is a January 2012 letter from the Area Director for the Northwest Regional Office of the Department of Interior's Bureau of Indian Affairs to the Union Pacific Railroad. Mot. for Clar. at 3, Ex. A (the "DOI Notice") [ECF No. 90-1]. The letter informed the Union Pacific Railroad that parcels of land that it no longer used for railroad purposes had reverted to the United States in trust for the Tribes. *See id.* at 2 (stating that "due to this automatic reversion, we believe that the areas within the [Congressional land] grant that are being used for purposes not authorized by the grants have reverted to the United States in trust for the Shoshone-Bannock Tribes."). According to the Tribes, the DOI Notice demonstrates that in 2012, the United States held the position that the land reverted to the United States in trust for the Tribes.

The second document is a letter sent by counsel for the Tribes during the settlement negotiations to counterparts at the Department of Justice. *Id.* Ex. B at 4 [ECF No. 90-2]. The letter includes a list of proposed exclusions from the Settlement's waiver, including a section

addressing railroad rights-of-way. Referencing the DOI notice, the Tribes' counsel wrote that "[w]e do not wish the settlement agreement to interfere or be interpreted to foreclose any rights or remedies the Tribes and the United States on our behalf may have relating to the railroad rights-of-way." *Id*. at 6. The Tribes contend that the United States accepted their proposed exclusion in its entirety, and that Paragraph 6(i)'s reference to claims against third parties "exempted what the parties then understood to be *all* of the Tribes' claims arising from their rights in the reverted rights-of-way" and that it was not intended to "foreclose tribal claims against the United States arising from a federal change in position occurring after May 16, 2012." Mot. for Clar. at 14

The Government counters that the Tribes cannot assert their right-of-way claims against the United States because the Settlement unambiguously waived any and all claims, known or unknown, relating to the United States's management or accounting of the Tribes non-monetary trust assets. Opp'n to Mot. for Clar. at 13-14. Because the Settlement is unambiguous, the Government also argues that the parol evidence rule precludes the Court from considering the Tribe's extrinsic evidence to alter or supplement Paragraph 6(i), and that the Court should disregard parol evidence of prior negotiations or agreements because the settlement is an integrated agreement. *Id*. at 16; 19-20.

The Settlement Agreement waives the Tribe's right-of-way claims against the United States for harms or violations that occurred before May 16, 2012. It includes a clear provision waiving "all claims, causes of action, obligations, and/or liabilities of any kind or nature whatsoever, known or unknown, regardless of legal theory, for any damages or any equitable or specific relief, that are based on harms or violations occurring" before May 2012 "and that relate to Defendants' management or accounting of Plaintiff's trust funds or Plaintiff's non-monetary

6

trust assets or resources." Settlement ¶ 4. Because the Tribes assert that the railroad lands reverted to the United States in trust for the Tribes, their claims are related to the United States' management of the Tribes' non-monetary trust assets. Furthermore, the Settlement explicitly addresses third parties in the exception to the waiver provision, and does not mention the United States.[2] *See* Settlement ¶ 6(i) (stating that the Settlement "shall not diminish or otherwise affect in any way . . . Plaintiff's claims against third parties for the wrongful use of railroad rights-of-ways located off the Fort Hall Reservation."). Because the Settlement's waiver is clear, the Court will not consult extrinsic evidence to interpret the contract. *See Johnson*, 1996 WL 33658687, *6 ("it stands to reason that [in the face of an integrated agreement,] if the contract is unambiguous, the Court may not look to parol evidence or extrinsic circumstances to determine its meaning."); *United States v. Sears, Roebuck & Co.*, 623 F. Supp. 7, 9 (D.D.C. 1984), *aff'd*, 778 F.2d 810 (D.C. Cir. 1985) (reviewing contract terms and finding "no ambiguity calling for the examination of extrinsic evidence to interpret the contract").

The Tribes also argue that the contract is latently ambiguous because it does not address what would happen if the United States changed its position on the railroad rights-of-way. "Latent ambiguity can arise where language, clear on its face, fails to resolve an uncertainty when juxtaposed with circumstances in the world that the language is supposed to govern." *Carter Oil Co. v. Am. Employers' Ins. Co.*, 69 F.3d 1160, 1167 (D.C. Cir. 1995); *see also NML Capital, Ltd. v. Rep. of Argentina*, No. 04-cv-1197, 2005 WL 8161968, at *9 (D.D.C. Aug. 3, 2005) ("Latent ambiguity exists when the disputed language is susceptible to more than one meaning."). But there is no latent ambiguity in the Settlement; faced with the current

---

[2] At oral argument, counsel for the Tribes advanced a novel theory that the United States became a third party to the contract when it changed its position on the Tribes' land interests. That argument is unavailing. The United States is a party to the Settlement; it does not become a third party by allegedly breaching it.

circumstance, the contract is still clear. The Tribes have not waived right-of-way claims against third parties, but have waived their claims against the United States for harms or violations that occurred before the Settlement. To the extent the Tribes did not anticipate the United States' changed position, the Settlement Agreement waives claims that were "known or unknown" at the time of the Settlement, and the Court must give effect to all the contract's provisions. *See Segar v. Mukasey*, 508 F.3d 16, 22 (D.C. Cir. 2007) ("it is a 'cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other.'" (edit accepted) (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63 (1995)).

Finally, the Settlement was drafted with the assistance of able counsel and contains a fulsome integration clause. *See* Settlement ¶ 16 (providing that the Settlement is the "entire agreement" between the parties, and that "[a]ll prior conversations, meetings, discussions, drafts and writings of any kind are specifically superseded" by the Settlement). The Settlement supersedes the Tribe's correspondence with the United States and any understanding they may have had about the railroad rights-of-way. *See Johnson*, 1995 WL 33658687, at *5-6 (concluding that the parol evidence rule precluded the consideration of extrinsic evidence in the face of a fully integrated agreement).

### C.     The Idaho District Court Should Determine Whether the Tribes' Claims Are Based on Harms or Violations that Occurred Before May 16, 2012.

The parties do not dispute that the Tribes' waiver is limited to claims based on harms or violations that occurred before May 16, 2012, the date the Court approved the Settlement. Mot. for Clar. at 11;  Opp'n to Mot. for Clar. at 28. The Settlement supports this reading. *See* Settlement ¶ 4 (waiv[ing], release[ing] and covenant[ing] not to sue … on any and all claims . . .

known or unknown . . . that are based on harms or violations occurring before the date of this

Court's entry of this Joint Stipulation of Settlement as an Order.").

The Tribes ask the Court to clarify that their claims arose after the parties signed the

Settlement because the United States has since reversed its position, embodied in the DOI

Notice, that the land reverted to the United States in trust for the Tribes.  Reply at 14. The United

States contends that the Tribes have waived their claims because the harms and violations

underlying them arose when the Union Pacific Railroad stopped using the parcels for railroad

purposes, which occurred no later than 1998. Opp'n to Mot. for Clar. at 28.

There is no dispute that the Union Pacific Railroad ceased using the parcels for railroad

purposes long before the parties signed the Settlement. *See* Mot. for Clar., Ex. D (Am. Compl. ¶

25) (alleging that the 3.74 acre parcel was "relinquished by the [Union Pacific Railroad] in

1964"); *id*. ¶¶ 196-200 (alleging that the Union Pacific Railroad sold the bus depot building to

the City of Pocatello in 1991, and leased the land to the City to be used as a bus station in 1996

and 1999); *id*. ¶¶ 205-209 (alleging that the Union Pacific Railroad leased the parking lot area to

the City of Pocatello for non-railroad purposes starting in 1936, and that those leases have since

been renewed); *id*. ¶¶ 212-213 (alleging that the Union Pacific Railroad assigned or conveyed the

credit union building for non-railroad purposes beginning in 1976); *id*. ¶ 25 (alleging that the

49.92 acre parcel was relinquished in 1989). However, there is no legal bases on which to

resolve the Tribes' motion regarding the timing of the right-of-way claims with the briefing

currently before the Court. In order to determine when the harms or violations occurred, the

Court must examine the underlying causes of action, assess the Tribes' specific claims, such as

the quiet title claims, and determine when reversionary land interests arise and are extinguished.

Although the parties briefed some of these issues in their motion to dismiss in the Idaho

litigation, they have not briefed them here. Opp'n to Mot. for Clar. at 28. Adjudicating these issues, as well as the DOI Notice's impact, may also require resolving factual disputes through evidentiary proceedings that are outside the scope of a motion for clarification.[3] *See, e.g., All. of Artists & Recording Companies, Inc. v. Gen. Motors Co.*, 306 F. Supp. 3d 413, 418–20 (D.D.C. 2016) (clarifying aspects of a previous memorandum opinion). Furthermore, given that the Tribes' claims relate to the boundaries of their reservation, it would be imprudent for the Court to rule without a full understanding of the land interests created through the relevant treaties and Congressional acts. *See McGrit v. Oklahoma*, 140 S.Ct. 2453, 2469 (2020) (reiterating that once "a reservation is established, it retains that status until Congress explicitly indicates otherwise," and cautioning against judicial abrogation of treaties) (internal quotations omitted). The Idaho district court is better suited to resolve these issues in context, and can do so while adjudicating the United States's other bases for its motion to dismiss. Opp'n Mot. for Clar. at 10. Accordingly, the Court will deny the Tribe's Motion for Clarification as to this issue.

## IV.     The Motion to Enforce the Settlement Agreement

The Tribes request that the Court enforce the Settlement by enjoining the United States from arguing in the Idaho district court that the Settlement bars their claims. Mem. in Supp. Mot. to Enforce Settlement at 5. They argue that the United States has breached the Settlement by changing its position on the rights of way after 2012, and contend that by seeking dismissal based on the Settlement, the defendants "misuse[] the Court's order in an attempt to frustrate and interfere with the Tribes rights and remedies" relating to the lands. Reply at 4.

---

[3] For example, the parties dispute whether the DOI Notice was the United States's official position, and what parcels of land the DOI Notice covered. *See, e.g.,* Opp'n to Mot. for Clar. at 22; Reply at 12.

## A.     Legal Standard

"It is well established that federal district courts have the authority to enforce settlement agreements entered into by litigants in cases pending before them." *Samra v. Shaheen Bus. & Inv. Grp.,* 355 F. Supp. 2d 483, 493 (D.D.C. 2005). This authority extends to cases, such as this one, that have been dismissed but where courts retained jurisdiction to enforce the agreements. *See, e.g., Smartnet, Inc. v. Kellman*, No. 04-cv-103, 2009 WL 856467 at *1 (D.D.C. Mar. 30 2009). "An action to enforce a settlement agreement is, at bottom, an action seeking the equitable remedy of specific performance of a contract." *Hall v. George Washington Univ.*, No. 99-cv-1136, 2005 WL 1378761, at *3 (D.D.C. May 13, 2005). "In most cases, a district court can enforce a settlement agreement summarily." *Samra*, 355 F. Supp. 2d at 493.

## B.     The United States Has Not Breached the Settlement Agreement

The Settlement does not bar the United States from raising the Settlement as a defense to the Tribe's claims in the Idaho district court. The Settlement's waiver does not extend to the United States' ability to assert defenses in future litigation. *See* Settlement § 6(g) ("nothing in this Joint Stipulation of Settlement shall diminish or otherwise affect in any way: (g) [a]ny defenses that Defendants have or may have regarding any claims that Plaintiff may assert in subsequent litigation or administrative proceedings."). The Tribes' motion to enforce the Settlement will be denied.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Tribes' Motion for Clarification of the Settlement Agreement [ECF No. 90] will be granted in part and denied in part. The Tribes' Motion to Enforce the Settlement Agreement [ECF No. 103] will be denied. An appropriate order accompanies this opinion.

September 10, 2020

_____

Thomas F. Hogan
SENIOR UNITED STATES DISTRICT JUDGE